Joe CHURCH, Gregory Jacobs, Michael Dooly, and Frank Chisom, Plaintiffs–Appellees,

v.

CITY OF HUNTSVILLE, Defendant–Appellant.

No. 93–6827.

United States Court of Appeals, Eleventh Circuit.

Aug. 5, 1994.

E. Cutter Hughes, Jr., H. Knox McMillan, Bradley Arant, Rose & White, Huntsville, AL, for appellant.

Mitchell D. White, Huntsville, William J. Freeman, Birmingham, AL, for appellees.

Before EDMONDSON and CARNES, Circuit Judges, and HENDERSON, Senior Circuit Judge.

CARNES, Circuit Judge:

This is a section 1983 class action lawsuit brought on behalf of the homeless residents of Huntsville, Alabama ("the City"). The plaintiffs allege that the City has deprived them of various constitutional rights as part of a concerted effort to drive them out of the City. The plaintiffs seek declaratory and injunctive relief, as well as compensatory damages for loss of property and emotional distress. After a hearing, the district court preliminarily enjoined the City, its agents, and its employees from:

 (a) implementing a policy of isolating and/or removing members of the defined class from the City of Huntsville simply because of their status as homeless persons[;]

 (b) harassing, intimidating, detaining or arresting members of the defined class, *solely because of their status as homeless persons,* for walking, talking, sleeping, or gathering in parks or other public places in the City of Huntsville;

 (c) using the City of Huntsville's zoning or building code ordinances to shut down, close, or condemn a private shelter used or intended to be used by homeless citizens *unless* the continued occupancy of such shelter poses a clearly demonstrable, imminent danger to the health and/or safety of its intended or actual occupants or the general public[.]

Preliminary Injunction at 2 (emphasis in original). The City then filed this interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1), seeking vacation of the preliminary injunction.

In part I of this opinion, we address the question of the plaintiffs' standing. We hold in subpart A that the plaintiffs have standing to seek to enjoin the actions described in the first two parts of the injunction. However, in subpart B we hold that they lack standing to seek to enjoin the City's use of its building code and zoning ordinance to close homeless shelters. In part II, we review the first two parts of the preliminary injunction on the merits, addressing in subpart A, the standard of review. In subpart B, we hold that the

plaintiffs have failed to show a substantial likelihood that a City policy or custom resulted in a deprivation of their constitutional rights. In part III, we conclude by vacating the preliminary injunction and remanding the case to the district court.

## I. THE PLAINTIFFS' STANDING

" '[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.' " *Sims v. Florida Dep't of Highway Safety & Motor Vehicles,* 862 F.2d 1449, 1458 (11th Cir.) (en banc) (alteration in original) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975)), *cert. denied,* 493 U.S. 815, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). To establish standing, a plaintiff must have "suffered an injury-in-fact that would be corrected by [a] favorable decision in the lawsuit." *Cheffer v. McGregor,* 6 F.3d 705, 708 (11th Cir.1993). Absent a redressable injury, a judicial determination of a plaintiff's claim would amount to an advisory opinion prohibited by Article III's case and controversy requirement. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–72, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982). As the Supreme Court has explained:

 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Id.* at 472, 102 S.Ct. at 758 (citations omitted).

In addition to these constitutional requirements, the federal courts have also imposed three prudential limitations on their exercise of jurisdiction. These self-imposed restraints include:

 [ (1) ] the principle that federal courts should avoid deciding generalized grievances that present abstract questions of wide public significance, [ (2) ] the require-

ment that the plaintiff's complaint be within the zone of interests protected by the statute or constitutional guarantee at issue, and [ (3) ] the requirement that a plaintiff ... assert his own legal rights and interests, not the rights of third parties.

*Cone Corp. v. Florida Dep't of Transp.,* 921 F.2d 1190, 1203 n. 43 (11th Cir.) (internal quotations and citations omitted), *cert. denied,* 500 U.S. 942, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991).

■ "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal...." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Nonetheless, standing requirements "are not mere pleading requirements but rather [are] an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Therefore, each element of standing must be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* For example, when lack of standing is raised in a motion to dismiss, the issue is properly resolved by reference to the allegations of the complaint. *Id.* at ——, 112 S.Ct. at 2137. When standing is challenged in a motion for summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" demonstrating standing, which are taken as true for summary judgment purposes. *Id.* (quoting Fed.R.Civ.P. 56(c)). Ultimately, to prevail, the standing "facts (if controverted) must be supported adequately by the evidence adduced at trial." *Id.* (internal quotation omitted). As a preliminary matter, then, we must determine the "degree of evidence" by which the plaintiffs must have established their standing at this point in the litigation.

■ The precise issue this case presents is not the degree of evidence by which plaintiffs ordinarily must establish standing in order to obtain a preliminary injunction but, instead, how much evidence a plaintiff must present to obtain a preliminary injunction

when the defendant raises no standing issue. In the district court, the City did not question plaintiff's standing. Because standing is jurisdictional, the City's failure to raise the issue does not bar our consideration of it here. *See FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("[S]tanding 'is perhaps the most important of [the jurisdictional] doctrines,'" (second alteration in original) (quoting *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)); *Glickstein v. Sun Bank/Miami, N.A.,* 922 F.2d 666, 672 n. 12 (11th Cir.1991) (holding that jurisdictional issues may be raised for the first time on appeal). However, as a matter of fairness, the City's failure to question the plaintiffs' standing in the district court does affect the standard to which we will hold plaintiffs at this stage of the proceedings. It is not unfair to require every plaintiff to file a complaint which contains sufficient allegations of standing and to prove standing at trial. It might well be unfair, however, to impose a standing burden beyond the sufficiency of the allegations of the pleadings on a plaintiff seeking a preliminary injunction, unless the defendant puts the plaintiff on notice that standing is contested. That is especially true in cases, such as this one, where the plaintiffs had only a few hours of hearing time to present their preliminary injunction case and were thereby forced to limit their evidence to what they reasonably understood to be the contested issues. In these particular circumstances, and for present purposes only, we think that the plaintiffs' standing should be judged on the sufficiency of the allegations of the complaint, with any preliminary hearing evidence favorable to the plaintiffs on standing treated as additional allegations of the complaint. *Cf. Cone Corp. v. Florida Dep't of Transp.,* 921 F.2d 1190, 1206 n. 50 (11th Cir.) ("If, when it addresses the standing issue, the court ... considers facts not disclosed in the complaint, the court, in effect, treats the complaint as having been amended to conform to the evidence." (citations omitted)), *cert. denied,* 500 U.S. 942, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991).[1]

---

1. We leave for another day a determination of the degree of evidence necessary to support

standing at the preliminary injunction stage

## A. THE PLAINTIFFS' STANDING TO SEEK TO ENJOIN THE CITY FROM ARRESTING, HARASSING, OR REMOVING THE PLAINTIFFS

■ The first two parts of the preliminary injunction bar the City from harassing or removing the plaintiffs from the City because of their homeless status. The City contends that the plaintiffs lack standing to seek such injunctive relief because they have not alleged or proven a sufficient "likelihood that they will suffer in the future from the actions sought to be enjoined." The City maintains that, under *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), to have standing the plaintiffs must allege, and ultimately prove, either that the police unlawfully arrest and detain every homeless person with whom they come into contact, or that the City has ordered or authorized its officers to do so. According to the City, the plaintiffs fail the *Lyons* test because they have neither alleged nor established "a real and immediate threat that any homeless person (much less all) would be illegally arrested in the future."

■ Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury. *Id.* at 102, 103 S.Ct. at 1665. Logically, "a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." *American Postal Workers Union v. Frank,* 968 F.2d 1373, 1376 (1st Cir.1992). Although "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974), "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Lyons,* 461 U.S. at 102, 103 S.Ct. at 1665 (alterations in original) (quoting *O'Shea,* 414 U.S. at 496, 94 S.Ct. at 676).

In *Lyons,* police officers had stopped Lyons for a traffic violation. *Id.* at 97, 103 S.Ct. at 1663. Although he offered no resistance or provocation, the officers applied a chokehold that rendered him unconscious and seriously injured him. *Id.* at 99, 103 S.Ct. at 1664. Lyons sued for damages and an injunction to bar future police use of chokeholds absent an immediate threat of deadly force. *Id.* at 98, 103 S.Ct. at 1663. The district court granted a preliminary injunction, the court of appeals affirmed, but the Supreme Court reversed. *Id.* at 99–100, 103 S.Ct. at 1664. The Supreme Court reasoned that Lyons' standing rested on the mere speculation that the police *might* stop him again and that, if stopped, the arresting officers *might* apply an unconstitutional chokehold. The Court concluded:

> In order to establish an actual controversy in this case, Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner.

*Id.* at 105–06, 103 S.Ct. at 1667. According to the Court, there was no "real and immediate threat" that either of the causes of Lyons' past injury—his illegal conduct that led the police to stop his vehicle and the ensuing police conduct—would recur in the future. Lyons' standing to seek damages for his past injuries, while not questioned by the Court, simply did not establish that he "faced a realistic threat from the future application of the City's policy." *Id.* at 106 n. 7, 103 S.Ct. at 1668 n. 7.

The situation in this case differs materially from that in *Lyons,* because the plaintiffs here are far more likely to have future encounters with the police than was Lyons. It is true that the federal courts are "generally . . . unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at

when the plaintiff is on notice that standing is contested.

risk of that injury." *Honig v. Doe,* 484 U.S. 305, 320, 108 S.Ct. 592, 602, 98 L.Ed.2d 686 (1988) (collecting cases). Thus, in *Lyons,* the Supreme Court refused to assume that the plaintiff would again violate the traffic laws, prompting the police to stop him. However, the Supreme Court has held that such reluctance is not warranted when, for reasons beyond the plaintiff's control, he or she is unable to avoid repeating the conduct that led to the original injury at the hands of the defendant. *Id.,* 108 S.Ct. at 602.

In *Honig,* public school officials unilaterally removed an emotionally disturbed adolescent from the classroom for misconduct, and they did so without observing the procedural requirements of the Education of the Handicapped Act ("the EHA"), 20 U.S.C. §§ 1400 *et seq.* On the facts before it, the Supreme Court concluded that it was reasonable to assume that the adolescent would return to the classroom. Given his "prior history of behavior problems," the Court found it "certainly reasonable" to believe that he would "again engage in classroom misconduct." *Id.* The Court also found it "equally probable" that school officials would again attempt to remove the adolescent from the classroom without complying with the EHA. *Id.* at 321, 108 S.Ct. at 603. Accordingly, the Court held that the adolescent *could* seek to enjoin school officials from unilaterally removing students in violation of the EHA.[2] *Id.* at 323, 108 S.Ct. at 604.

Similarly, in *Lynch v. Baxley,* 744 F.2d 1452, 1456–57 & nn. 6–7 (11th Cir.1984), citing *Lyons,* we held that a mentally ill plaintiff had standing to seek an injunction against Alabama's practice of detaining individuals in county jails pending civil commitment hearings. Even though the plaintiff

was no longer incarcerated when he was added as a named plaintiff, we reasoned that his mental problems were likely to recur and that "[t]here [was] every indication that [he] could continue to be the subject of [future] involuntary commitment petitions." *Id.* at 1456. We observed that the plaintiff was "at risk of being detained in jail not because of volitional acts on his part but because his mental condition would prompt his family, as it [had] done on two previous occasions, to petition for involuntary commitment." *Id.* at 1457 n. 7.

This case, at least on the face of the complaint, is closer to *Honig* and *Lynch* than to *Lyons.* The plaintiffs allege that they are homeless because: "(1) they are mentally disabled from employment . . .; (2) they are physically disabled from employment; (3) they are seeking but are currently unable to find employment; or (4) they are employed, but at such a low rate of pay that they are unable to secure shelter." The plaintiffs further allege that "[f]orces beyond [their] control, such as illness, unemployment, penury, and [lack of public shelters] . . . have compelled [them] to live and sleep in public." The tenor of the plaintiffs' complaint, as well as of their evidentiary presentation at the preliminary injunction hearing, is that they are homeless involuntarily. Because of the allegedly involuntary nature of their condition, the plaintiffs cannot avoid future "exposure to the challenged course of conduct" in which the City allegedly engages. *O'Shea v. Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974).

The likelihood that City officials will continue to respond to the plaintiffs' conduct in ways similar to those described in the plaintiffs' complaint is also greater here than in *Lyons.* The *Lyons* Court concluded that,

---

**2.** The *Honig* Court framed its discussion in terms of mootness instead of standing. However, "[m]ootness is merely 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Tucker v. Phyfer,* 819 F.2d 1030, 1035 n. 6 (11th Cir.1987) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980) (internal quotation omitted)). Jurisdictionally, *Honig* and *Lyons* are analogous. In

each case, the plaintiff suffered a discrete injury in the past and sued to enjoin future recurrences of that wrong. The plaintiff's ability to prosecute the action turned solely on the prospects that the defendant would wrong the plaintiff in a similar manner in the future. Thus, for present purposes, the relevant question is whether this case resembles *Honig,* where the Court found that a recurrence was sufficiently likely, or *Lyons,* where the Court held the risk of repeated injury to be too speculative.

even if the police stopped Lyons again, there was no reason to believe that they "would illegally choke him into unconsciousness without any provocation." *Lyons*, 461 U.S. at 105, 103 S.Ct. at 1667. Lyons alleged that municipal policy "authoriz[ed] the use of chokeholds in situations where [the officers] are threatened by far less than deadly force." *Id.* at 106 n. 7, 103 S.Ct. at 1667 n. 7 (internal quotation omitted). However, that allegation was insufficient to confer standing on Lyons, because it did not necessarily follow that "the City either orders or authorizes application of the chokeholds when there is no resistance or other provocation"—which is what had happened to Lyons. *Id.* Instead, the evidence showed that "police officers were instructed to use chokeholds only when lesser degrees of force do not suffice and then only to gain control of a suspect who is violently resisting the officer or trying to escape." *Id.* at 110, 103 S.Ct. at 1669 (internal quotation omitted). Because Lyons had not resisted police—and there was no indication he would do so if stopped again in the future—he had no basis to challenge a policy that only authorized use of chokeholds against suspects who resist arrest. *Id.* at 111, 103 S.Ct. at 1670 ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").

In this case, the plaintiffs allege that municipal policy authorizes the constitutional deprivations that they claim to have suffered at the hands of City officials. They allege a City "custom, practice and policy of arresting, harassing and otherwise interfering with homeless people for engaging in the ordinary and essential activities of daily life in the public places where Plaintiffs are forced to live. Plaintiffs and the class have been and continue to be arrested and charged." They further allege that the City "does not and will not arrest non-homeless people who engage in precisely these activities for which the Plaintiffs have been in the past arrested and reasonably expect in the future to be arrested," "namely sleeping, eating, bathing, standing on the sidewalks, [and] associating with family and friends." According to the plaintiffs, these actions by the City violate the Fourth Amendment prohibition against unreasonable seizures, the Eighth Amendment prohibition against cruel and unusual punishment, and the Equal Protection Clause. The plaintiffs also allege a City "custom, practice, and policy of seizing and destroying the personal property of the Plaintiffs including identification, clothing, medication, food and bedding materials before, during and after ... encounters with the Plaintiffs." According to the plaintiffs, these seizures violate the Fourth and Fifth Amendments. Finally, the plaintiffs allege that the City has adopted "a well organized and coordinated campaign to drive the poor, mentally disabled and homeless out of the City." In furtherance of that plan, it is alleged that in early June 1993 the City evicted the homeless (including at least one of the named plaintiffs) from under the bridges and overpasses in the City, and that the City has made efforts "to remove the homeless from different locations targeted by the City." The plaintiffs have alleged that it is the custom, practice, and policy of the City to commit the constitutional deprivations of which they complain.

This case is therefore distinguishable from *Lyons*, where the alleged policy did not necessarily authorize the constitutional deprivation Lyons suffered. If true, the plaintiffs' allegations in this case would establish a substantial likelihood that, absent an injunction, the City will continue to act in a similar manner toward them in the future. Therefore, the plaintiffs have standing to seek the injunctive relief contained in the first two parts of the preliminary injunction, which enjoin the City from arresting, harassing, or removing the plaintiffs because of their homeless status. Whether the plaintiffs have established a right to that injunctive relief on the merits is a matter we discuss in part II.B, below at pages 1342–46.

B. THE PLAINTIFFS' STANDING TO SEEK INJUNCTIVE RELIEF AGAINST THE CITY'S ENFORCEMENT OF ITS BUILDING CODE AND ZONING ORDINANCE

The district court found that the City had discriminated against homeless shelters

in its enforcement of its building code and zoning ordinance in order "to discourage the establishment and continued operation of homeless shelters in residential areas of the City." On appeal, the City argues that the named plaintiffs have not satisfied Article III's redressability requirement:

> Any injunctive relief pertaining to homeless shelters would be of *no* benefit to the named plaintiffs, however, because they do not desire to live in Huntsville's homeless shelters. As a result, they have no standing to pursue any claim with respect to the effect on homeless shelters of City enforcement actions.

Although the City's assertion that none of the named plaintiffs desire to live in shelters is not accurate, we agree with the City that the named plaintiffs lack standing to enjoin enforcement of the building code and zoning ordinance.

> We have held that:

> Individual standing requirements must be met by anyone attempting to represent his own interest or those of a class. If the named plaintiff seeking to represent a class fails to establish the requisite case or controversy, he may not seek relief on his behalf or on that of the class.

*Lynch v. Baxley,* 744 F.2d 1452, 1456 (11th Cir.1984) (citing *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974)). Thus, unless the plaintiffs have alleged that one of the *named* plaintiffs is in real and immediate danger of being personally injured by the City's enforcement of its building code and zoning ordinance, the plaintiff class lacks standing to challenge the alleged City practice, " 'even if the persons described in the class definition would have standing themselves to sue.' " *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987) (quoting *Brown v. Sibley,* 650 F.2d 760, 771 (5th Cir. Unit A July 1981)), *cert. denied,* 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988).

The complaint does not allege that any named plaintiff has lost shelter in the past as a result of the City's enforcement of its building code or zoning ordinance. Nor is there any allegation in the complaint that any of the four named plaintiffs currently resides at a shelter that is threatened with an enforcement action; instead, the complaint alleges that the four named plaintiffs "have no home or shelter." For the reasons discussed above on page 1336, we now look to the record of the preliminary injunction hearing to determine whether any facts established there rectify this omission from the complaint.

 The evidence presented at the preliminary injunction hearing does nothing to bolster the named plaintiffs' standing. Only two of the named plaintiffs, Frank Chisom and Michael Dooly, testified at the preliminary injunction hearing. Chisom testified that he had been staying "in the Alpine Street address that was closed," and that he was there, "right before they closed it." The "Alpine Street address" was a private home on Alpine Street that homeless advocates had converted into a temporary shelter. Because it was in a neighborhood zoned for one and two family residences only, the Alpine facility was closed after City authorities cited it for noncompliance with the City zoning ordinance. When asked why he had agreed to be a named plaintiff in this lawsuit, Chisom replied, "I know our rights was violated. See, I was doing a lot better at that house." Chisom's testimony, although not unambiguous, suggests that his stay at the Alpine Street facility was ended by the City's enforcement action, and thus, that the enforcement of the zoning ordinance against the Alpine Street facility injured him.

However, at the time of the hearing, Chisom was a resident at a temporary shelter established by the Downtown Rescue Mission ("the Rescue Mission").[3] The Rescue Mission has never been the subject of a building code enforcement action, and there is no allegation or evidence that any such action is

---

**3.** The Rescue Mission operates a privately sponsored homeless shelter in Huntsville. The Rescue Mission has a permanent shelter providing approximately 160 beds (with overflow capacity of about 60). However, intoxicated persons are not permitted to stay at the shelter. At various times the Rescue Mission has also operated a temporary shelter with approximately 26 beds. This facility is sometimes referred to as the "detox" facility; guests are permitted to stay until the effects of their intoxication wear off, at which time they may be admitted to the regular shelter.

imminent. There is nothing in the record to suggest that the Rescue Mission has been or is currently in violation of the City's zoning ordinance or any part of the building code. Therefore, there is no "reasonable likelihood" that Chisom will lose his current shelter due to the City's future enforcement of its building code or zoning ordinance. *Honig,* 484 U.S. at 318, 108 S.Ct. at 601. Chisom lacks standing to seek the relief provided by the third part of the preliminary injunction, because he has not "credibly allege[d] that he face[s] a realistic threat from the future application of the City's policy." *Lyons,* 461 U.S. at 106 n. 7, 103 S.Ct. at 1668 n. 7.

Even if we were to characterize Chisom's alleged injury, not as loss of shelter *per se,* but instead as his loss of shelter at the Alpine Street residence, he would still lack standing. There is no allegation (or evidence) that the cessation of the City's enforcement activities is reasonably likely to lead to the reopening of the Alpine facility. Moreover, the plaintiffs have alleged that there are approximately 700 homeless persons in the City, and the record evidence indicates that the Alpine facility housed, at most, 32 persons. Given these facts, and the fact that Chisom did have other shelter at the time of the hearing, it requires too much speculation and conjecture to conclude that enjoining the City from enforcing its building code and zoning ordinance against homeless shelters will remedy Chisom's alleged injury. Thus, Chisom fails to satisfy the Article III redressability requirement.

■ Named plaintiff Dooly testified that he also had stayed at the Alpine Street facility "on occasion[ ]." However, there is nothing in his testimony, just as there is nothing in the complaint, to indicate that Dooly lost his shelter because the City enforced the zoning ordinance against the facility. Therefore, he has not adequately alleged that he has been injured by the actions he seeks to enjoin. Dooly testified that at the time of the hearing, he was residing under a bridge. He expressed no desire to be housed in a shelter. To the contrary, he testified that he "choose[s] not to stay" at one of the presently available shelters because he "had more rights in jail than [he] did there." There is

no "reasonable likelihood" that Dooly will lose his current shelter due to the City's enforcement of its building code or zoning ordinance. Like Chisom, Dooly has not "credibly allege[d] that he face[s] a realistic threat from the future application of the City's policy." *Lyons,* 461 U.S. at 106 n. 7, 103 S.Ct. at 1668 n. 7.

The plaintiffs allege that members of the City Council have voiced an intention to rezone parts of the City in order to close existing homeless shelters. However, the plaintiffs do not allege that any such change is imminent. Nor does the ·record of the preliminary injunction hearing provide any evidence that we might construe as such an allegation. Additionally, the plaintiffs do not allege that any zoning change would necessarily affect the Rescue Mission, the only shelter at which any of the named plaintiffs have been shown (or alleged) to reside. Taking all the allegations and record evidence together, there is nothing to indicate that any named plaintiff faces a real and immediate danger of losing his current shelter because of the City's enforcement of its building code or zoning ordinance. The named plaintiffs are therefore without standing to seek an injunction against such enforcement. That portion of the preliminary injunction that enjoins the City's use of its building code or zoning ordinances to close facilities used or intended to be used as shelters for the homeless is therefore due to be vacated for lack of standing.

## II. THE MERITS OF THE PLAINTIFFS' CLAIMS FOR INJUNCTIVE RELIEF

Having concluded in part I.A that the plaintiffs' allegations are sufficient, at this early stage of the proceedings, to support standing with respect to the first two parts of the preliminary injunction, we now review on the merits those parts of the preliminary injunction.

### A. THE STANDARD OF REVIEW

■ This Court reviews the grant of a preliminary injunction for abuse of discretion. *Haitian Refugee Ctr., Inc. v. Baker,*

953 F.2d 1498, 1505 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 1245, 117 L.Ed.2d 477 (1992). "However, if the trial court misapplies the law we will review and correct the error without deference to that court's determination." *Id.*

The district court "must exercise its discretion in light of the four prerequisites for the 'extraordinary relief' of [a] preliminary injunction." *Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir.1992) (quoting *West Point–Pepperell, Inc. v. Donovan*, 689 F.2d 950, 956 (11th Cir.1982)). Before granting a preliminary injunction, the district court must find that the plaintiffs have established:

(1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable injury if the injunction were not granted;

(3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and

(4) that granting the injunction would not disserve the public interest.

*See, e.g., Nnadi*, 976 F.2d at 690. Because "[t]he preliminary injunction is an extraordinary and drastic remedy," it is "not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal quotation omitted). As we have previously explained:

[P]reliminary injunctions of legislative enactments—because they interfere with the democratic process and lack the safeguards against abuse or error that come with a full trial on the merits—must be granted reluctantly and only upon a clear showing that the injunction before trial is definitely demanded by the Constitution and by the other strict legal and equitable principles that restrain courts.

*Id.* It is in this context that we address whether the district court abused its discretion by granting the plaintiffs a preliminary injunction that enjoins the City from:

(a) implementing a policy of isolating and/or removing members of the defined class from the City of Huntsville simply because of their status as homeless persons;

(b) harassing, intimidating, detaining or arresting members of the defined class, *solely because of their status as homeless persons,* for walking, talking, sleeping, or gathering in parks or other public places in the City of Huntsville.

Preliminary Injunction at 2 (emphasis in original). Because we conclude that the plaintiffs failed to establish a substantial likelihood of success on the merits, we will not address the three other prerequisites of preliminary injunctive relief. *Cf. Northeastern Fl. Chapter*, 896 F.2d at 1285 ("We need not address each element because we conclude that no showing of irreparable injury was made.").

### B. THE PLAINTIFFS HAVE NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS WITH RESPECT TO THE EXISTENCE OF A CITY POLICY TO ARREST, HARASS, OR REMOVE THEM

Municipalities may only be held liable under section 1983 if " 'action pursuant to official municipal policy of some nature caused a constitutional tort.' " *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 729, 109 S.Ct. 2702, 2719, 105 L.Ed.2d 598 (1989) (quoting *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978)). "[O]nly those municipal officers who have final policymaking authority may by their actions subject the government to § 1983 liability." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality opinion) (internal quotation omitted). Whether an official has final policymaking authority is a question of state law. *Id.*

Municipal liability for the actions of a subordinate employee cannot be based solely on the theory of *respondeat superior. Jett*, 491 U.S. at 736, 109 S.Ct. at 2723. However, liability will attach for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval

through the [municipality's] official decision-making channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2036. "'Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Id.* at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). A municipality can be liable when "a series of decisions by a subordinate official manifest[s] a 'custom or usage' of which the supervisor must have been aware." *Praprotnik,* 485 U.S. at 130, 108 S.Ct. at 928.

■ Thus, municipal liability may be based upon (1) an action taken or policy made by an official responsible for making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker. The plaintiffs have not shown a substantial likelihood of success under either approach.

### i. Formal Policy

■ The plaintiffs have not shown a formal City policy to expel them from the City or to deprive them of their constitutional rights. The plaintiffs rely on statements made to the media by City Councilman Bill Kling that those homeless who do not work, and thus contribute to the community, should be "show[n] ... the city limits." In granting the preliminary injunction, the district court concluded that Kling was the City's "principal policymaker" on homeless issues, and that his inflammatory statements were indicative of an "unannounced, but nonetheless official, policy of the City of Huntsville to isolate homeless citizens from the established residential areas," and ultimately, to remove them from the City itself.

■ The imposition of municipal liability requires a decision by a final policymaker, not a "principal" one. In any event, the record in this case contains no evidence that Councilman Kling is either the City's principal policymaker or its final policymaker with respect to the homeless. The plaintiffs concede that, under Alabama law, final policy-making authority rests with the entire five-member City Council and the Mayor, yet the plaintiffs have produced no evidence to suggest that the Council and Mayor have delegated this authority to Kling. *See generally Praprotnik,* 485 U.S. at 124, 108 S.Ct. at 924 (stating that authority to make municipal policy may be delegated). There is no evidence that the Council ever adopted Kling's statements against the homeless. Although Kling suggested a zoning change to restrict shelters to non-residential areas, the Council never made such a change. That fact, by itself, establishes that Kling is not the City's final policymaker on the issue of the homeless; if he were, the zoning change would have been made.[4] The plaintiffs may not prevail on the basis of the actions or words of a single councilmember, such as Kling.

The plaintiffs argue that a videotape of the June 10, 1993 City Council meeting provides "clear evidence that the City has been making use of city ordinances and laws for the purpose of removing the Homeless and not otherwise addressing their problems." The Constitution does not guarantee the homeless that their problems will be addressed, nor does it protect them from enforcement of ordinances and laws unless that enforcement violates a specific constitutional right. Nothing in the videotape, or elsewhere in the record, indicates that the Council authorized or condoned any violation of the plaintiffs' constitutional rights. The videotape of the council meeting actually undermines the plaintiffs' case. It shows that at the meeting a number of homeowners complained about

---

4. At a City Council meeting on June 10, 1993, Councilman Kling proposed amending the City's zoning ordinance to isolate group dwellings, such as homeless shelters, away from residential areas. However, even if we were to accept the plaintiffs' implausible suggestion that such a change would violate their constitutional rights, *cf. Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (upholding a zoning ordinance that restricted land use to single-family residences), the mere proposal by one councilmember of such a change does not indicate a municipal policy. In any event, Council President Saunders pretermitted discussion of Kling's proposal saying, "I think changing the law is not the answer at this particular time"; no vote was taken on the proposal.

some real problems resulting from violation of City ordinances and building codes by and on behalf of the homeless. Those homeowners angrily demanded that the homeless be removed from their neighborhoods *immediately*, regardless of the procedural mandates of state or municipal law. In response, City Council President Chuck Saunders admonished the homeowners: "Don't ask us to do something to violate the law. We didn't get elected to violate the law but to serve the law." After repeated complaints by homeowners, Saunders reiterated: "Your answer to that problem is for us to violate the law; I can't accept that, I won't accept that." Councilman Jim Putnam also stated: "We're doing everything that we can under the law. There is due process, [these] people have their rights to due process." These comments are hardly indicative of a municipal policy to run roughshod over the constitutional rights of the homeless.[5] Instead, the videotape shows City Council members explaining to their constituents the legal limitations on municipal action, including the need to respect the rights of the homeless.

The existence of a formal municipal policy to remove the homeless from the City is also belied by the testimony of City Police Officer John Hollingsworth and homeless advocate James Holland. Officer Hollingsworth, the police representative on the Mayor's Homeless Advisory Commission, testified that he was not aware of any police policy or custom to deprive homeless persons of their property. He also denied the existence of any policy of arresting homeless persons solely for being in public places. Similarly, Holland testified that after two years as a full-time advocate for the homeless in Huntsville, he was aware of only one instance of what he would call police "harassment." The evidence does not support an inference that this single instance of "harassment" in two years constituted a constitutional violation. Even assuming that the incident was a constitutional violation, it certainly does not establish

a pattern or evidence a policy. Holland characterized his working relationship with City police as "very good," and testified that, at his request, City police have occasionally called him to pick up intoxicated homeless persons instead of arresting them. Given their vantage points, Hollingsworth and Holland were likely to know of any official City policy, announced or otherwise, to violate the plaintiffs' constitutional rights. Neither of them did.

The plaintiffs point to the removal of the homeless from under the bridges and overpasses in the City as evidence of a City policy to exclude the homeless from the municipality and to violate their constitutional rights. It is uncontested that the City's final policymakers knew of and supported the plan which led to eviction of the homeless from under the bridges in early June 1993. It is also clear that the City suggested the evictions to the State Highway Department, which has jurisdiction over the bridges and overpasses. However, there is no evidence that the City violated the constitutional rights of the evicted homeless persons. DeJarvis Leonard, the district engineer for the Alabama State Highway Department, testified that his department was responsible for removing the personal property and makeshift structures of the homeless from under the bridges. The State was also responsible for storing any personal items taken from under the bridges. Officer Hollingsworth, who was present during the second and third days of the three-day operation, testified that the City police's "only function was to assist the state to keep peace" and to protect state employees. According to DeJarvis Leonard, this peace-keeping function included "mak[ing] initial contact with those individuals" under the bridges "prior to ... someone from the highway department giving them trespassing warrants." None of the homeless witnesses could testify with any specifici-

---

5. The Huntsville City Council has five members. President Saunders and Councilman Putnam are no more "final policymakers" than is Councilman Kling. However, their statements demonstrate both that Kling was not the final policymaker on homeless issues and that the Council was, at most, divided over the course of action to

pursue. Their statements also suggest that the City had not authorized any violation of the plaintiffs' rights. The other two councilmembers said nothing during that meeting, or at any other time insofar as the record shows, to indicate that they disagreed with the sentiments expressed by Saunders and Putnam.

ty as any additional role of the City police in the bridge sweep operation.[6]

Even if we were to impute to the City full responsibility for the removal of the homeless and their property, we would still be unable to agree that such action is indicative of a City policy to violate the rights of the homeless. The Constitution does not confer the right to trespass on public lands. Nor is there any constitutional right to store one's personal belongings on public lands. In this case, the property owner, the State of Alabama, authorized the removal of the homeless and their belongings from under the bridges and overpasses. It is irrelevant that the State made its decision at the request of the City and that City workers aided state employees in carrying out that decision. The plaintiffs allege a constitutional violation in the failure to return to the homeless any personal belongings that were removed but not destroyed, but the uncontroverted evidence at the hearing was that these items are, and have always been, in the possession of the State, not the City.

### ii. Pervasive Practice or Custom

■ The plaintiffs also have failed to show a substantial likelihood of success under the "practice or custom" approach. In *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir.1986), this Court held that to establish a practice or custom:

> it is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. Normally random acts or isolated incidents are insufficient to establish a custom or policy.

In *Depew*, a police brutality case, we upheld a jury verdict for the plaintiffs on the basis of approximately five prior incidents of exces-

sive force. We held that "while the mayor and [city] council members were aware of prior complaints of excessive force, they continued to assert that the department's supervision was satisfactory and that the officers were doing a good job." *Id.* at 1498. Because "the city had knowledge of improper police conduct, but failed to take proper remedial action," *id.* at 1499, the jury could legitimately infer that the city "had implicitly ratified a custom or policy permitting the police to use excessive force against its citizens," *id.* at 1501. In *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir.1987), another police brutality case, we explained that:

> A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a "custom or policy" if the municipality tacitly authorizes these actions or displays deliberate indifference towards the police misconduct.

We reversed the district court's judgment for the plaintiff, holding that "[q]uite simply, there [was] no evidence that city officials were aware of past police misconduct." *Id.*

Here, with the exception of the eviction of the homeless from under the bridges, there is no evidence that any final policymaker was ever aware of the various incidents described by the witnesses at the hearing. Moreover, the evidence did not establish that City employees had a pervasive practice of violating the plaintiffs' constitutional rights. The four homeless witnesses at the preliminary injunction hearing all testified that the City police had repeatedly "harassed" them, but they described only a few isolated instances with any specificity. Much of what the witnesses called "harassment" consisted of the police arresting them for public intoxication when they were admittedly intoxicated.[7] The Con-

---

6. There was some testimony that City police officers participated in the process of determining which property should be destroyed as unsanitary, and which property should be kept by the State to be reclaimed by the bridge people. However, there is no evidence that this aspect of the police activity was authorized by a final policymaker.

7. Named plaintiff Michael Dooly testified that he had been arrested for public intoxication several

times, and admitted that he had been intoxicated on all but one of those occasions. Robert Lee Turner also testified that the police had harassed him by arresting him for public intoxication when he was admittedly drunk. Named plaintiff Frank Chisom testified that he had been arrested for public intoxication on numerous occasions, but that City police officers "[say] you're drunk when you're not drunk. Whether you're drunk or not." However, Chisom's testimony is not inconsistent with the existence of probable cause;

stitution does not exempt the homeless from the laws against public intoxication, and the enforcement of those laws, when there is probable cause to believe that they have been violated, is not unconstitutional.[8] The other incidents related by the witnesses, for the most part, occurred a year or more before the hearing. Even assuming that they amounted to constitutional violations, such isolated incidents can not support a finding that the plaintiffs demonstrated a substantial likelihood that a pervasive practice of constitutional violations now exists.[9] Furthermore, even if the evidence would support a finding of a pervasive practice, there was no evidence to suggest that the City Council or Mayor had actual or constructive knowledge of the incidents reported by the witnesses.

The plaintiffs attempted to prove that the City was aware of a practice of constitutional violations by using a passage in a 1991 demographic study commissioned by the City. The study notes that "during the six months prior to our [census of the homeless,] street people in Huntsville had been 'rousted' with some regularity by the police and other city officials." However, this evidence alone cannot support a finding of municipal liability. First, there is no evidence from which a trier of fact could conclude that "roust[ing]" involved a violation of the plaintiffs' constitutional rights. Even if we assume that "roust[ing]" involves the use of force, the constitutionality of the use of force by police against citizens is governed by the reasonableness standard of the Fourth Amendment: "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). The study's use of the single word "rousted" provides no information on the circumstances in which force was used, nor the amount of force applied. The evidence simply does not support an inference that the homeless persons' constitutional rights were violated. Second, the study dates from 1991, and is therefore not conclusive as to the existence of a City effort to expel the homeless at the time the complaint was filed in June 1993. Third, contrary to the plaintiffs' position, the fact that the study was commissioned by an unidentified City department does not demonstrate that the

---

8. The plaintiffs complain that they are frequently arrested for intoxication, detained overnight, and then released without ever seeing a magistrate or having an "opportunity to raise any of their valid and substantial defenses to these charges." We have previously noted that "[t]he government possesses broad discretion in determining whom to prosecute, subject to constitutional constraints prohibiting the exercise of such discretion based on race or other invidious grounds." *United States v. Petit*, 841 F.2d 1546, 1554 (11th Cir.), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988). That the City prosecutor declines to prosecute the homeless for public intoxication does not divest the City police of the authority to arrest individuals whom they have probable cause to suspect have violated the law. We "do not question the power of the [government] to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regained his powers. The person's own safety and the public

police detention of an individual for probable cause does not violate the Fourth Amendment. *See Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir.1990) ("The existence of probable cause, however, is an absolute bar to a section 1983 action for false arrest.").

interest require this much. A [public intoxication] statute … is constitutional insofar as it authorizes a police officer to arrest any seriously intoxicated person when he is encountered in a public place." *Powell v. Texas*, 392 U.S. 514, 554 n. 5, 88 S.Ct. 2145, 2165 n. 5, 20 L.Ed.2d 1254 (1968) (White, J., concurring in the result).

9. For instance, witness Robert Lee Turner testified that when he was homeless in 1991, City police, on two occasions, took him into custody for public intoxication, transported him beyond the City limits, and released him. Named plaintiff Michael Dooly testified that one night in 1988, City police had twice picked him up and then released him at other locations in Huntsville. No evidence was offered to connect these stale incidents, or to link them to more recent incidents of a similar nature. Although Dooly testified that he had been barred from a public park since 1988, he did not explain the circumstances surrounding his expulsion. We therefore cannot determine whether any of his constitutional rights were infringed. Furthermore, homeless witnesses Jordan and Chisom testified that they had never been asked to leave a public park. Their testimony belies the existence of a pervasive practice or City custom of excluding the homeless from public parks.

final policymakers, here the City Council and the Mayor, were aware of its content.[10]

## III. CONCLUSION

The part of the preliminary injunction barring the City from enforcing its building code and zoning ordinance fails for lack of standing. As to the remainder of the preliminary injunction, the plaintiffs have failed to establish the existence of a municipal policy or a pervasive practice that could serve as a predicate to municipal liability under section 1983. Therefore, they have not shown a substantial likelihood of success on the merits, and those parts of the preliminary injunction fail for that reason.

The preliminary injunction is VACATED and the case REMANDED for further proceedings consistent with this opinion.[11]

---

10. Because the plaintiffs' evidence fails to establish a City policy or practice of removing the homeless, we do not address the plaintiffs' novel (and poorly briefed) arguments concerning the impact of the alleged City policy on their rights to vote and to travel. Similarly, we will not review any issues involving the class definition adopted by the district court, because such review is not necessary to our review of the preliminary injunction. Three other circuits have held that "a pendent class certification order is not appealable under section 1292(a)(1) unless the preliminary injunction issue cannot properly be decided without reference to the class certification question." *Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir.1982) (en banc); *see also Port Auth. Police Benevolent Ass'n v. Port Auth.*, 698 F.2d 150, 152 (2d Cir.1983) (holding that a class certification order is reviewable on interlocutory appeal if it is "substantially interdependent" with an appealable ruling); *Payne v. Travenol Lab., Inc.* 673 F.2d 798, 807–08 (5th Cir.) (holding that a court may review a class certification order on interlocutory appeal when it

"shape[s] the contours of [the appealable] injunctive relief"), *cert. denied*, 459 U.S. 1038, 103 S.Ct. 451, 74 L.Ed.2d 605, *and cert. denied*, 459 U.S. 1038, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982). Moreover, even if we have pendent appellate jurisdiction over the class certification issue, we decline to exercise it in this case. *Cf. Swint v. City of Wadley*, 5 F.3d 1435, 1449 (11th Cir.1993) ("We have stated repeatedly that whether to exercise pendent appellate jurisdiction is discretionary."), *modified on other grounds*, 11 F.3d 1030 (11th Cir.), *cert. granted on other grounds*, — U.S. —, 114 S.Ct. 2671, 129 L.Ed.2d 808 (1994).

11. The City urges us to dismiss the case with prejudice because the plaintiffs' remaining legal theories are "incapable of success." However, the City never moved for summary judgment in the district court, and we cannot transform our review of the preliminary injunction into a *de facto* motion for summary judgment. *See Latecoere Int'l, Inc. v. United States Dep't of the Navy*, 19 F.3d 1342, 1365–66 (11th Cir.1994).