[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-11787

Non-Argument Calendar

_____

MARY JOSEPHINE OUTLAW,

JAMES GREGORY OUTLAW,

Plaintiffs-Appellants,

*versus*

PLANTATION PIPE LINE COMPANY,

KINDER MORGAN ENERGY PARTNERS, L.P.,

Defendants-Appellees.

———————————————

Appeal from the United States District Court

for the Northern District of Georgia

D.C. Docket No. 4:20-CV-00047-TCB

———————————————

Before BRANCH, BRASHER, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

Plaintiffs-Appellants Mary Outlaw and her son, James Outlaw, (the "Outlaws") appeal the district court's order granting summary judgment for Defendants-Appellees Plantation Pipe Line Company ("PPL") and Kinder Morgan Energy Partners, L.P. ("KMEP"), on the Outlaws' claims for negligence, trespass, nuisance, and strict liability related to the purported contamination of a well on the Outlaws' property. In granting summary judgment for Defendants, the district court (1) denied the Outlaws' motion under Federal Rule of Civil Procedure 56(d) to defer consideration of Defendants' summary judgment motions, and (2) construed KMEP's motion for summary judgment as a motion for dismissal under Federal Rule of Civil Procedure 4(m) with respect to failure to effect service of process, which the court granted. For the reasons discussed below, we affirm the district court's order.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

Mary Outlaw owns several acres of property in Rome, Georgia, (the "Property") and lived on the Property until 2018. Her son, James, has lived on the Property since 2011. The Property is adjacent to a petroleum pipeline that runs from PPL's facility in Bremen, Georgia, to its facility near Knoxville, Tennessee (the "8KX pipeline").

On February 20, 2018, Mary's other son, Mark Outlaw, contacted PPL to report potential contamination of a well located on the Property. PPL sent out technicians that day to investigate and perform tests. The PPL technicians looked for signs of a leak in the pipeline and took water samples, but they did not find any leaks or signs thereof. While the tests of the water samples showed that the water contained some petroleum-related compounds, the testing also revealed that the water contained several other chemical compounds not found in the gasoline transported in the 8KX pipeline, but instead those that are typically used in solvents. Based on these findings, PPL concluded that if there was water contamination, it was not from the 8KX pipeline, as the petroleum-related compounds in the water were present in many other non-gasoline products such that their mere presence was not indicative of gasoline release. Mark also had his own tests done on the water samples at the University of Georgia. Those test results showed the presence of hydrocarbons in the gasoline range in the water. But the University of Georgia did not test for other chemicals or compounds.

Two years later, in February 2020, a neighbor reported a potential pipeline spill on his property from the same 8KX pipeline. PPL took the pipeline temporarily out of service, confirmed there was a release, and made repairs within the month. A report on this pipeline release concluded that it was of small volume and that most of the accumulation was (1) concentrated in an abandoned well not located on the Outlaws' property, and (2) removed from the neighbor's property. The report on the 2020 spill noted that "crews arrived onsite . . . and found an area of discolored and stressed grass with gasoline odor." The 2020 report stated that "[t]he presence of an active release was confirmed when gasoline was observed dripping from a crack in the pipe." "Chemical analysis of the [substance] indicated it [was] gasoline," and PPL acted quickly to remove the leaked gasoline and the impacted soil. Investigation into the 2020 release did not uncover significant accumulations or show that significant volumes of released product had passed through subsurface areas. And there is no evidence in the record that the 2020 leak impacted the Outlaws' property.

On February 20, 2020—a few days after the spill on the neighbor's property—the Outlaws sued PPL and KMEP, asserting that gasoline leaked from the 8KX pipeline and contaminated soil and the well on the Property. The Outlaws asserted claims for: (1) negligence; (2) trespass; (3) nuisance; and (4) strict liability. And they sought: (1) relief for property damage; (2) relief for emotional distress; (3) punitive damages; (4) remediation; (5) post-judgment

21-11787-BB          Opinion of the Court          5

interest, costs, and attorneys' fees based on bad faith; and (6) other relief the Court deems just and proper.

PPL was served through its registered agent, Capitol Corporate Services, Inc. ("Capitol"), on February 26, 2020. The Outlaws also sought to serve KMEP through Capitol, but Capitol did not accept service because it was not KMEP's registered agent and because KMEP was not registered to do business in Georgia. Capitol returned service unexecuted to the Outlaws' counsel and notified them they were not KMEP's registered agent. The Outlaws made no further attempts to serve KMEP.

PPL and KMEP answered the complaint on March 18, 2020, in which, among other things, KMEP asserted an affirmative defense of insufficient service of process.[1] The same day, the district court issued an order regarding the outbreak of COVID-19, which extended discovery for thirty days as to any case where discovery had already started or would start by April 16, 2020. Discovery began in this case on April 17, 2020—thirty days after PPL and KMEP filed their answer. Therefore, this case did not receive a thirty-day extension under the COVID order, and discovery was set to end on December 18, 2020. Separately, in response to the pandemic, the chief judge of the Northern District of Georgia issued General Order 20-01. General Order 20-01 and its amendments extended "trial specific deadlines" along with jury duty, and in-person court appearances. General Order 20-01 "[did] not affect the [c]ourt's

---

[1] KMEP also asserted that it was not a proper party to the action.

consideration of civil or criminal motions that can be resolved without oral argument."

The parties filed their joint report and discovery plan on April 17, 2020. In this plan, the parties stated that they "antici-pate[d] delays in the discovery period as a result of governmental orders issued to reduce the spread of the COVID-19 virus and pro-hibiting non-essential contact between individuals," and requested the longest possible discovery track allowed under the Northern District of Georgia's Local Rules: eight months. *See* N.D. Ga. Lo-cal R. 26.2(A). The district court approved their discovery plan.

After the close of discovery, PPL and KMEP filed a joint mo-tion for summary judgment, contending that the evidence demon-strated there was no genuine dispute of material fact. KMEP also separately moved for summary judgment because it had not been properly served with process. After responding to both motions for summary judgment, the Outlaws filed a Rule 56(d) motion to defer or deny Defendants' motions. It was not until responding to these summary judgment motions—almost three months after the close of discovery—that the Outlaws informed the district court that they had taken no depositions, hired an expert witness, or drafted an expert report.

On April 23, 2021, the district court entered an order that: (1) granted the Defendants' joint motion for summary judgment; (2) construed KMEP's motion for summary judgment as a motion for dismissal under Rule 4(m); (3) granted KMEP's construed Rule 4(m) motion; and (4) denied the Outlaws' Rule 56(d) motion.

21-11787-BB          Opinion of the Court          7

The Outlaws filed this timely appeal.[2]

## II.   STANDARD OF REVIEW

We review an order granting summary judgment de novo, viewing all the evidence and drawing all reasonable factual inferences in favor of the nonmoving party. *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017).  Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  We may not weigh evidence or make credibility determinations, which "are jury functions, not those of a judge." *Lewis v. City of Union City*, 934 F.3d 1169, 1179 (11th

---

[2] We issued a jurisdictional question to the parties as to: (1) whether the relevant pleadings sufficiently alleged each party's citizenship so as to invoke the district court's diversity jurisdiction in the first instance; and (2) insofar as the jurisdictional allegations may be inadequate, whether (i) the allegations should be amended on appeal, pursuant to 28 U.S.C. § 1653, to cure any jurisdictional deficiencies in the current pleadings, (ii) whether current record evidence adequately establishes the parties' citizenship, or (iii) whether the record should be supplemented with additional evidence to demonstrate the parties' citizenship.  Following the parties' responses, we remanded to the district court for the limited purpose of determining the citizenship of the parties to establish whether diversity jurisdiction existed at the time of the complaint.

On remand, the district court permitted the Outlaws to amend their complaint to state their citizenship and Defendants to supplement the record with facts showing their citizenship for diversity purposes.  The district court concluded that diversity existed between the parties, as the Outlaws were Georgia citizens and Defendants were citizens of Texas and Delaware.  We agree with the district court that complete diversity existed at the time the Outlaws filed their initial complaint.

Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)). But if the evidence presented by the non-moving party is "merely colorable" or not "significantly proba-tive," summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). And "[s]peculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018) (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).

We review a district court's ruling on a Rule 56(d) motion for abuse of discretion. *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1330 (11th Cir. 2021)

### III.    ANALYSIS

We begin our analysis by addressing the district court's de-nial of the Outlaws' Rule 56(d) motion before turning to the district court's grant of summary judgment.

### A.    The Outlaws' Rule 56(d) Motion

Under Federal Rule of Civil Procedure 56(d), a nonmoving party to a motion for summary judgment may show "by affidavit or declaration" that, for specific identified reasons, it "cannot pre-sent facts essential to justify its opposition." If the nonmovant does so, the district court has discretion to delay consideration of the summary judgment motion, deny the motion, allow additional time for discovery, or issue another order it deems appropriate

under the circumstances.  *Id.*  To invoke the protection of Rule 56(d), the nonmovant must show that "postponement of a ruling on the motion will enable [her], by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact."  *Burns*, 999 F.3d at 1334 (quoting *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1287 (11th Cir. 2019)).

"[V]ague assertions that additional discovery will produce needed, but unspecified facts" will not satisfy the non-movant's burden.  *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1316 (11th Cir. 1990) (quoting *Wallace v. Brownell Pontiac-GMC Co.*, 703 F.2d 525, 527 (11th Cir. 1983)).  We will not overturn a court's discovery rulings under Rule 56 unless the appellant can show that those rulings "resulted in substantial harm to the appellant's case."  *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003).

Here, the district court found that (1) the Outlaws had taken no depositions, disclosed expert witnesses, or produced expert reports during the eight months of discovery and (2) they did not inform the court they lacked the evidence they needed until their response to Defendants' motions for summary judgment.  The district court found that the motion was because the Outlaws essentially "request[ed] that discovery be reopened" months after the extended discovery deadline had closed.  The district court reasoned that although the Outlaws' counsel and his paralegal both had COVID during the last week of discovery, "counsel ha[d] not indicated that it was impossible for him to conduct business remotely

or coordinate with Defendants' counsel via email with respect to asking for an extension." The district court further concluded that the Rule 56(d) motion failed on the merits. The court explained that neither the access agreement nor the protective order between the parties required PPL to perform work for the Outlaws for purposes of this litigation. The court also explained that, to the extent the Outlaws "mistakenly believed that they could use in this lawsuit the report [PPL] was preparing for other purposes and avoid the expense of hiring their own expert and conducting discovery, the responsibility for the mistake [was] theirs." Finally, the district court noted that Plaintiffs' motion failed to address their lack of evidence regarding damages.

On appeal, the Outlaws only address the COVID issue, contending that "[t]he sole reason the [c]ourt dismissed Plaintiffs' claims was because the Plaintiffs were unable to gather the required evidence and hire an expert witness during COVID-19" and that they did not seek an extension only because their counsel was sick with COVID during the final week of discovery. They also argue that, despite the eight-month discovery period, "[t]he gathering of evidence and the obtaining of expert witnesses was substantially hindered by the pandemic" and that discovery deadlines within the Northern District of Georgia were tolled by General Order 20-01. Finally, the Outlaws argue that a recent decision of the Georgia Court of Appeals, *First Merit Credit Services v. Fairway Aviation, LLC*, 860 S.E. 2d 126 (Ga. Ct. App. 2021), held that

discovery deadlines were tolled during the pandemic by order of the Georgia Supreme Court.

Defendants counter that the Outlaws "failed to show that the requested extension of discovery would allow them to rebut PPL and KMEP's motions for summary judgment" and that, as such, the ruling did not result in substantial harm. Defendants note that, during the eight months of discovery, the Outlaws failed to take depositions, disclose expert witnesses, or produce expert reports, and that the Outlaws did not address their lack of evidence on damages in their Rule 56(d) motion nor explain why they did not seek an earlier extension of the discovery deadline. Defendants also assert that the district court did not abuse its discretion in interpreting the access agreement between PPL and Mary Outlaw as not requiring PPL to conduct discovery on the Outlaws' behalf.

Here, the district court did not abuse its discretion in denying the Rule 56(d) motion. First, the Outlaws failed to take depositions, procure an expert witness, or draft an expert report in the nearly eight months of discovery that elapsed before Appellants' counsel was diagnosed with COVID. Their counsel's COVID diagnosis occurred with only one week of discovery left. Even assuming the Outlaws' counsel was too sick to email opposing counsel requesting a discovery extension during that week, it is unclear why counsel waited until the last week of an eight-month discovery period to make such a request. Indeed, the district court set an eight-month discovery period, the longest of three discovery tracts permitted under the district's Local Rules. *See* N.D. Ga. Local R.

26.2(A).  And as the district court explained, the Outlaws waited until three months after discovery concluded to request what would amount to the reopening of discovery.  A district court has broad discretion in handling discovery in cases before it.  *See Harris v. Chapman*, 97 F.3d 499, 506 (11th Cir. 1996) ("District judges are accorded wide discretion in ruling upon discovery motions, and appellate review is accordingly deferential.").  We cannot say that the district court abused its discretion here by denying what amounted to a discovery extension request three months after the close of discovery, where the requesting party took no depositions or conducted any expert discovery.  The district court was well within its discretion to deny such a request.

Second, Appellants misconstrue General Order 20-01 and its amendments.  In discussing the eighth amendment to General Order 20-01, Appellants omit from their extensive quotation that the quoted portion of the order deals specifically with clients in custody and the unique challenges counsel faces in those circumstances.  We note that, in response to the pandemic, General Order 20-01 and its amendments extended "trial specific deadlines" along with jury duty, and in-person court appearances, but not discovery.  And General Order 20-01 expressly states that it "does not affect the [c]ourt's consideration of civil or criminal motions that can be resolved without oral argument," which includes motions for summary judgment.  In sum, General Order 20-01 did not toll the discovery deadlines in this case.

Third, the March 18 order from the district court judge did not toll discovery in this case. The district court judge extended discovery deadlines in cases before him where discovery began before April 16, 2020, but discovery in this case started after that date, on April 17. The order made clear that discovery was to continue during the pandemic, as the "[c]ourt will continue to be available to handle discovery disputes, motions, and other matters via e-mail or phone conference." The district court also granted the parties' joint request for an eight-month discovery period—the longest available period—in this case after issuing its blanket order about COVID procedures.

Fourth, contrary to the Outlaws' contention, the Georgia Court of Appeals in *First Merit* did not hold that the Georgia Supreme Court's emergency order tolled any limitations period or discovery period but, rather, remanded to the state trial court for consideration of this issue. *See* 860 S.E.2d at 128, 132–33. Moreover, the unremarkable procedural holding in *First Merit* is not binding on the district court or this Court. *Cf. Royalty Network, Inc. v. Harris*, 756 F.3d 1351, 1357–58 (11th Cir. 2014) (holding federal court in diversity cases looks to federal procedure and state substantive law). We therefore reject this argument.

Finally, the Rule 56(d) motion fails on the merits. Under Rule 56(d), the Outlaws were required to specifically show how postponement of the district court ruling on the summary judgment motion would enable them, by discovery or other means, to rebut Defendants' showing of the absence of a genuine issue of

material fact. *See Fla. Power & Light*, 893 F.2d at 1316. But the Outlaws did not do so here. In their motion below, the Outlaws argued that PPL violated its obligations under an access agreement between the parties, in which they claim that PPL was to perform testing and report the results, and that they did not conduct substantial discovery or hire their own expert based on their reliance on that agreement. But this agreement does not require PPL to do any work for Appellants in relation to this litigation. Rather, the purpose of the agreement was to permit PPL to perform an environmental assessment on the Outlaws' property over an unspecified amount of time in return for payments to the Outlaws for access to the property. Nothing in the agreement discussed PPL providing an expert or expert report to the Outlaws or otherwise conducting any discovery on their behalf. Thus, as the district court explained, to the extent the Outlaws "mistakenly believed that they could use in this lawsuit the report [PPL] was preparing for other purposes and avoid the expense of hiring their own expert and conducting discovery, the responsibility for the mistake is theirs."

For all of these reasons, the district court did not abuse its discretion in denying Appellants' Rule 56(d) motion.

### B.    *KMEP's* Lack of Service

In its motion for summary judgment, KMEP argued that the district court did not have jurisdiction over it because KMEP was never properly served. The district court construed this motion as a Rule 4(m) motion to dismiss and granted the motion, dismissing

KMEP from the case because KMEP was not properly served.  In doing so, the court noted that the Outlaws served Capitol with KMEP's summons and a copy of the complaint.  But, as the court explained, Capitol was not KMEP's registered agent for service in Georgia nor was KMEP registered to do business in Georgia.

"To obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).  As a result, "[w]hen an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Id.*

Here, the Outlaws have failed to mention—let alone challenge—the district court's ruling as it pertains to KMEP's lack of service in its brief on appeal.  The Outlaws have thus abandoned any challenge to that aspect of the district court's ruling, and we affirm the district court's dismissal of KMEP from the case for lack of proper service.

## C.    Nuisance, Negligence, and Trespass Claims

"In order to prove any toxic related tort, a plaintiff's *prima facie* case must include proof of (1) defendant's release of specific chemicals into the environment, (2) plaintiff's exposure to the specific chemicals, (3) plaintiff's injury, and (4) causation of plaintiff's injury or damages by the exposure." *Satterfield v. J.M. Huber*

*Corp.*, 888 F. Supp. 1567, 1570 (N.D. Ga. 1995). Under Georgia law, nuisance, negligence, and trespass claims all require a plaintiff to show causation and damages. *See McBrayer v. Governors Ridge Office Park Ass'n, Inc.*, 860 S.E.2d 58, 62 (Ga. Ct. App. 2021) (nuisance); *Blondell v. Courtney Station 300 LLC*, 865 S.E.2d 589, 594 (Ga. Ct. App. 2021) (negligence); *Petree v. Dep't of Transp.*, 340 Ga. App. 694, 702 (Ga. Ct. App. 2017) (trespass).

In its order granting summary judgment, the district court held that the Outlaws failed "to provide evidence with respect to damages, not just causation." The district court stated that "[e]ven if Plaintiffs had provided evidence of a release from the pipeline onto their property, they have not provided evidence of property or personal damages," such as "expert testimony to support any personal injury complaints or any connection between medical records and purported injuries."

As explained above, "[w]hen an appellant fails to challenge properly on appeal one of the grounds on which the district court based its judgment, he is deemed to have abandoned any challenge of that ground, and it follows that the judgment is due to be affirmed." *Sapuppo*, 739 F.3d at 680. Here, the Outlaws' brief is devoid of any discussion on the issue of damages, which the district court ruled on as an independent basis to grant summary judgment. The Outlaws have thus abandoned any challenge to the district court's ruling on this issue. And without damages, their nuisance, negligence, and trespass claims fail.

But even if the Outlaws had not abandoned any challenge to the district court's ruling on damages, the district court did not err in holding that there was no evidence of causation. "Causation is an essential element of nuisance, trespass, and negligence claims. To establish proximate cause, a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury." *Toyo Tire N. Am. Mfg., Inc. v. Davis*, 787 S.E.2d 171, 175 (Ga. 2019) (quoting *Toyo Tire N. Am. Mfg., Inc. v. Davis*, 775 S.E.2d 796, 800 (Ga. Ct. App. 2015)). "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." *Lore v. Suwanee Creek Homeowners Ass'n, Inc.*, 699 S.E.2d 332, 338 (Ga. Ct. App. 2010). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant." *Id.* at 338–39.

The evidence in the record, taken in the light most favorable to the Outlaws, does not show that it is more likely than not that a spill from the pipeline in 2018 contaminated the well or any other part of the Outlaws' property. PPL's water sample test—the only test that tested for a broad spectrum of chemical compounds—found that the well water from the Property was contaminated by several compounds that were not present in the gasoline transported in PPL's 8KX pipeline but, instead, were "typically used as

solvents." While the Outlaws' test from the University of Georgia showed the existence of carbon compounds in the range of gasoline, the undisputed expert testimony makes clear that those carbon compounds exist in many substances other than gasoline. PPL's expert stated that the analytical result from the University's test indicated that "there were gasoline range hydrocarbons in the samples . . . , but it does not mean that 'gasoline' was detected." PPL's expert explained that "[b]ecause there are many compounds with carbon ranges in from [sic] C5 to C8, further evaluation and/or analyses would be needed to determine if the TPH-GRO detected in the sample contains compounds dissolved from gasoline." But the University's test did not conduct this further analysis or test for other chemical compounds; at best, the test shows that there was contamination from a substance containing carbon ranges from C5 to C8. But PPL's test, the only test analyzing all the substances in the water samples, showed that compounds existed in the well water that are not present in gasoline from the 8KX pipeline. Appellants do not dispute the existence of these compounds or the veracity of PPL's test. Thus, the evidence shows that it is not more likely than not that leaked gasoline from PPL's pipeline was the cause of the contamination.

The January 2018 inspection report from KMEP is also no help to Appellants on the causation issue. The 2018 report notes that there was a dent and "shallow gouge" that was "less than 10 [millimeters] deep" somewhere along the pipeline. The gouge was "buffed smooth," indicating that the gouge did not go through the

pipe or result in a leak.  Indeed, the 2018 report states the "nominal wall thickness" of the pipe was 0.322 inches, while the gouge was 0.267 inches at its "maximum depth."   Additionally, the photographs included in the 2018 report do not provide any visual evidence of a breach of the pipe.  The 2018 report therefore indicates that there was no leak at this undetermined location.  Another PPL document describes how the pipeline was pressure tested and probed in January 2018 but notes that this investigation "did not reveal evidence of a release."  And the Ticket Audit Report dated February 8, 2018, does not provide evidence of a leak; it merely shows that PPL marked the location of the pipeline on a nearby property on February 8 and then an individual conducted work twenty feet away from the pipeline.

Contrast this with PPL's report related to a spill in 2020 that occurred on a nearby property.  The 2020 report noted that "crews arrived onsite . . . and found an area of discolored and stressed grass with gasoline odor."  The 2020 Report stated that "[t]he presence of an active release was confirmed when gasoline was observed dripping from a crack in the pipe," that "[c]hemical analysis . . . indicated it [was] gasoline," and that PPL acted quickly to remove the leaked gasoline and the impacted soil.  But as the district court correctly noted, "Plaintiffs have provided no evidence that the released gasoline product reached their property."  Moreover, the Outlaws suit is premised on the alleged 2018 leak, not the 2020 leak. There is no evidence of the 2018 leak and no evidence that the 2020 leak impacted the Outlaws.

Thus, even if the Outlaws had not abandoned their nuisance, negligence, and trespass claims when they failed to discuss damages in their brief, they have also failed to show causation. We therefore affirm the district court's grant of summary judgment as to these claims.

## D.    Strict Liability and Punitive Damages

In the civil tort context, there is "no general rule of strict liability in Georgia." *Reeves v. Bridges*, 284 S.E.2d 416, 418 (Ga. 1981). Rather, "strict liability typically applies only to certain circumstances involving abnormally dangerous activities or where the General Assembly has recognized a need to explicitly impose strict liability in tort for the protection of the public." *McEntyre v. Sam's E., Inc.*, 870 S.E.2d 385, 389 (Ga. 2022) (footnote omitted).

Here, the Outlaws only mention strict liability once in their appellate brief but do not challenge the district court's holding that, with respect to this claim, "operating a petroleum pipeline of itself is not an ultrahazardous activity that warrants imposing strict liability." Rather, the Outlaws merely cite to O.C.G.A. § 12-14-4(a), which provides that "[a]ny person knowingly violating any provision of this chapter or rules or regulations established pursuant to this chapter shall be liable for a civil penalty of not more than $1,000.00 per day" and that "[e]ach day during which the violation continues may be considered a separate violation." Ga. Code Ann. § 12-14-4(a). We thus conclude that the Outlaws have abandoned

21-11787-BB          Opinion of the Court                    21

this issue.[3] *Sapuppo*, 739 F.3d at 681 ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

Finally, the Outlaws have not challenged the district court's ruling on their punitive damages claim and have thus abandoned that issue. *See id.* Accordingly, we affirm the grant of summary judgment as to these claims.

## IV.    CONCLUSION

For all these reasons, we conclude that the district court did not abuse its discretion in denying the Outlaws' Rule 56(d) motion and did not err in granting summary judgment for Defendants. Accordingly, we affirm the district court's order.

**AFFIRMED.**

---

[3] In any event, even if the Outlaws had not abandoned this issue, there is no evidence of a 2018 leak from the pipeline, let alone a leak that Defendants knew existed. Nor did the Outlaws rely on O.C.G.A. § 12-14-4(a) as their theory for strict liability below, but rather on the general concept of ultrahazardous activity. But we generally do not consider an issue raised for the first time on appeal and decline to do so here. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). For the same reason, we decline to consider the Outlaws' attempt to raise a negligence per se theory within their strict liability theory for the first time on appeal. *See id.*